IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PHILIP SHEAHAN,

                                                    OPINION AND ORDER

          Plaintiff,

                                                    18-cv-1020-bbc

    v.

DR. SALAM SYED,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Philip Sheahan, who is represented by counsel and incarcerated at the Columbia Correctional Institution, is proceeding on an Eighth Amendment and state law negligence claims that defendant Dr. Salam Syed failed to provide him adequate and timely medical care for what was later discovered to be symptoms of bladder cancer. The following motions are before the court: (1) the parties' cross motions for summary judgment, dkt. ##60 and 74; (2) plaintiff's unopposed motion for the court to take notice of certain adjudicative facts related to bladder cancer, dkt. #70; and (3) plaintiff's unopposed motion to supplement the record, dkt. #87.

Plaintiff's motions to take judicial notice of adjudicative facts and to supplement the record will be granted as unopposed. Because plaintiff has not shown that defendant acted with deliberate indifference to his medical condition, I will deny plaintiff's motion for summary judgment and grant defendant's motion for summary judgment with respect to plaintiff's Eighth Amendment claim. I decline to exercise supplemental jurisdiction over

1

plaintiff's remaining state law medical negligence claim and will dismiss that claim without prejudice.

From the parties' proposed findings of fact and the facts of which I have taken judicial notice, I find the following facts to be undisputed unless otherwise noted.

UNDISPUTED FACTS

A.  The Parties

Plaintiff Philip Sheahan is currently incarcerated at Stanley Correctional Institution, in Wisconsin, but at all times relevant to this case (late 2015 through summer 2016), he was incarcerated at the Columbia Correctional Institution.  Defendant Dr. Salam Syed was a physician at Columbia from 2014 until December 2018.  He also covered physician vacancies at other Wisconsin institutions from October 16, 2016 to July 7, 2017.

B.  Background Medical Information

1.  Rhabdomyolysis

Rhabdomyolysis is a condition in which damaged skeletal muscle breaks down rapidly.  Symptoms of the disease depend on its severity and whether kidney failure develops.  Milder forms of rhabdomyolysis may not cause any muscle symptoms.  More severe rhabdomyolysis is characterized by muscle pain, tenderness, weakness and swelling of the affected muscles.  Some of the muscle breakdown products, including proteins, are harmful to the kidneys and may lead to kidney failure.  Additional more generalized

symptoms may include weakness, vomiting and confusion. A patient with rhabdomyolysis also may have tea-colored urine or an irregular heartbeat.

In addition to reported symptoms, the level of Creatine Kinase (CK) present in a patient's blood is one tool that physicians use to consider whether a patient has rhabdomyolysis. The CK reference range (the lower and upper limits for healthy people) is 39-308 H. Severe disease occurs when CK levels exceed 5,000.

Treatment for rhabdomyolisis is symptomatic and requires educating the patient to avoid a "triggering event" of which there are many. Traumatic and non-traumatic triggering causes of rhabdomyolisis include:

- A crush injury such as from an auto accident, fall, or building collapse.

- Long-lasting muscle compression, such as that caused by prolonged immobilization after a fall or lying unconscious on a hard surface during illness or while under the influence of alcohol or medication.

- Electrical shock injury, lightening strike or third-degree burn.

- Venom from a snake or insect bite.

- The use of alcohol or illegal drugs such as heroin, cocaine or amphetamines.

- Extreme muscle strain, especially in someone who is an untrained athlete.

- The use of medications such as antipsychotics or statins, especially when given in high doses.

- Very high body temperature (hyperthermia) or heat stroke.

- Seizure or delirium tremens.

- A metabolic disorder such as diabetic ketoacidosis.

- Diseases of the muscles (myopathy) such as congenital muscle enzyme deficiency or Duchenne muscular dystrophy.

- Viral infections such as the flu, HIV or herpes simplex virus.

- Bacterial infections leading to toxins in tissues or the bloodstream (sepsis).

There is no specific time line for determining the effectiveness of a treatment plan for rhabdomyolisis. Generally, a patient responds to the treatment in days or even weeks. Laboratory testing is used to see whether CK levels are trending up or down and to monitor electrolytes derangement and renal functions. If a patient's CK levels are trending down, it means his rhabdomyolisis is responding to treatment. However, if there is a spike in the CK level, it could indicate that the triggering event, such as exercising, had occurred or resumed.

Rhabdomyolysis is more common within prison because recreation, exercise and sports are available for prison inmates, whereas unincarcerated individuals have more varied recreational opportunities available to them that do not require high levels of exertion. Recreation is highly valued by the prison population and sports-related injuries and exertional injuries are common.

2. Bladder cancer

According to the American Cancer Society, blood in the urine (hematuria) is the first sign of bladder cancer in most cases. However, blood in the urine may be present one day and absent the next, with the urine remaining clear for weeks or even months. Therefore, the lack of reported symptoms does not necessarily have any bearing on their clinical course or the evaluation that should be performed. If cancer stays in the inner layer of cells without

growing into the deeper layers, its called non-invasive. If the cancer grows into the deeper layers of the bladder, its called invasive. Invasive cancers are more likely to spread and are harder to treat.

After someone is diagnosed with bladder cancer, doctors will try to figure out whether it has spread, and if so, how far. This process is called staging. The stage of a cancer describes the extent or amount of cancer in the body and helps determine the seriousness of the cancer. The earliest stage of cancer is called stage 0 (or carcinoma in situ) and then ranges from stages I through IV. As a rule, the lower the number, the less the cancer has spread. A higher number signifies a more advanced cancer. Finding cancer early improves the chances that treatment will work.

## C. Plaintiff's Medical Treatment

### 1. Plaintiff's rhabdomyolysis diagnosis

On August 13, 2015, plaintiff began urinating blood. On August 14, he saw defendant and complained about painless hematuria (blood in the urine). He denied having weakness, shortness of breath, chest and flank pain or body aches. His vitals were normal. Plaintiff's urine sample was positive for blood. Although defendant suspected that plaintiff had been exercising vigorously, plaintiff denied it. Plaintiff did admit that he occasionally lifted weights moderately and occasionally did push-ups and pull-ups.

Because defendant suspected that plaintiff had rhabdomyolysis, he ordered laboratory tests of plaintiff's CK level. He also ordered a bladder and kidney ultrasound to see if there

was any unusual growth within plaintiff's bladder or other bladder and kidney abnormalities that may have caused plaintiff's reported symptoms. Defendant told plaintiff to drink water and stop exercising.

At a follow-up appointment on August 21, 2015, defendant reviewed plaintiff's test results. The ultrasound did not show any abnormalities. Laboratory testing revealed that plaintiff had normal kidney function and an elevated CK level of 572 H. Although plaintiff's CK level was elevated, defendant did not believe that it rose to the level of what a physician would consider serious rhabdomyolysis, particularly because plaintiff's kidney function was normal, he did not exhibit other symptoms of concern and he was otherwise stable and appeared well.

According to defendant, CK levels that are twice the normal limit are clinically considered rhabdomyolysis, but CK levels alone are not conclusive because people can have an increase in their CK level after exercise, with no other symptoms. Some people also have naturally higher baseline CK levels. Consistently high CK levels are of concern if there are accompanying symptoms. Typically, if an event such as a rigorous workout triggers a bout of rhabdomyolysis, CK levels will drastically increase but then will decrease within a few weeks.

2. Continued monitoring and complaints of blood in urine in 2015

Defendant next saw plaintiff on September 18, 2015 for hypothyroidism. A urinalysis performed that day showed "large" occult blood in plaintiff's urine. Dkt. #1-1 at

p. 4.  In addition, plaintiff's September 17 blood test showed that his red blood cell count was 11-25, which is more than the reference range of 0 - 3.  (The parties dispute what else happened during the September 18, 2015 appointment.  Defendant says that plaintiff did not make any complaints about his urinary symptoms and that plaintiff did not exhibit any physical symptoms that caused defendant to be concerned about rhabdomyolysis at that time.  Plaintiff says that he told defendant that he had stopped working out but still had blood in his urine and asked defendant whether something else could be causing the blood in his urine.)

Defendant ordered laboratory testing to determine whether plaintiff's CK levels were trending up or down.  On September 22, 2015, plaintiff's CK level was 406 H.  Defendant was pleased that plaintiff's CK level had dropped after he had treated plaintiff for hematuria.  In October 2015, plaintiff reported that he had been exercising vigorously.  By October 22, 2015, plaintiff's CK level had increased to 723 H.

On November 9, 2015, plaintiff submitted a health service request, complaining that he was still urinating blood even though he had stopped exercising.  He requested treatment for rhabdomyolysis.  On November 11, 2015, the health services unit responded that "Dr. Syed did not order I.V. fluids."  A urinalysis test performed on the same day revealed that plaintiff's urine was abnormally brown and that he had large occult blood in his urine.  His pH levels were 8.0 (reference range is 5.0 - 7.0), protein was 30 (reference range is negative) and erythrocytes (red blood cells) were more than 100 (reference range is 0 - 3).

On November 18, 2015, plaintiff submitted another health service request, stating that defendant had told him that he had rhabdomyolysis but that he had not received any treatment apart from being advised to drink water and stop exercising. Plaintiff also stated that he "was not given an I.V. to flush out my system or medicine to raise my salt levels" and requested a consultation with a urologist. On November 19, 2015, defendant placed plaintiff on a medical exercise restriction from recreation on for 30 days.

Defendant ordered laboratory testing to continue monitoring plaintiff's CK levels, which were 880 H on November 20, 2015, 1087 H on December 9, 2015, 688 H on December 30, 2015 and 651 H on January 13, 2016. During an appointment on December 4, 2015, defendant refused plaintiff's request to lift the recreation restriction so that plaintiff could go to the gym and shoot basketballs. (Defendant says that on December 4, 2015, plaintiff promised that he would not exhaust himself during exercise to assist with the symptoms of rhabdomyolysis. Plaintiff denies telling defendant on December 4 that he was exercising or promising not to exhaust himself. He also says that defendant extended the medical restriction on December 6 or 9, 2015 for an indeterminate amount of time. Defendant says that he did not extend the medical restriction after it ended on December 4.)

3. Additional urinary symptoms in 2016

Because plaintiff started urinating blood again on February 8, 2016, he contacted the health services unit on February 9 and stated that he had blood in his urine "yesterday

p.m.[,] and today no blood in urine, but extreme pain in kidney region, and pain when I urinate [with a] burning sensation through the penis. I was diagnosed with rhabdomyolisis, and haven't been working out[;] . . . could there be something that could be triggering the blood in urine, pain in kidney region, [and the] burning when I urinate other than rhabdomyolisis?" On February 10, plaintiff received a response stating that a sick call had been scheduled.

At an appointment with defendant on February 12, 2016, plaintiff complained about pain in his kidney region. A laboratory test completed on February 26, 2016 showed that plaintiff's CK level had increased to more than 1,700 H. Defendant suspected rhabdomyolysis and a potential urinary tract infection.

A follow up lab test performed on March 11, 2016 showed that plaintiff's CK level dipped to 553 H, the second lowest CK level of the nine tests that defendant had ordered for plaintiff. According to defendant, this confirmed that plaintiff's reported symptomology in February was related to a rhabdomyolysis event. Defendant did not order follow up CK level testing following this appointment because he was confident that the rise and fall of plaintiff's CK levels were evidence of mild rhabdomyolysis and not related to something more serious.

Defendant did not provide any other treatment for plaintiff's rhabdomyolisis other than hydration, reduction of exercise and blood test monitoring. He also never confirmed the triggering event for plaintiff's rhabdomyolisis. Defendant says that he could not have

discovered the cause or triggering event of plaintiff's rhabdomyolisis without daily lab tests and constant monitoring, which were not feasible in the prison setting.

Defendant did not see plaintiff again until April 5, 2016, when he treated plaintiff's asthma. Plaintiff did not report any urinary symptoms at this visit. On May 4, defendant prescribed Naproxen for plaintiff's pain. (Although the parties did not propose any other facts related to this prescription, plaintiff's medical records show that he previously had a prescription for Naproxen that expired on March 25, 2016. Dkt. #79-1 at 90. The parties do not explain why plaintiff needed pain medication or how long he had been experiencing pain, but I assume that the medication was prescribed to address plaintiff's complaints of pain in his kidney region.) Plaintiff could have purchased over the counter pain medication for any generalized pain that he was experiencing. According to defendant, narcotic or other stronger pain medication was not indicated by plaintiff's symptoms and would not be recommended to treat the conditions for which defendant had treated plaintiff.

4. June 2016 complaints of pain and urinary symptoms

On June 8, 2016, plaintiff was seen in the health services unit for low back pain. On June 17, 2016, plaintiff complained to defendant about muscle pain, low back pain and urinary symptoms, including hematuria. Defendant ordered prescription-strength Tylenol, lab tests and a bladder ultrasound. The June 23, 2016 ultrasound showed abnormalities in plaintiff's bladder including "filling defects in the bladder, apparently layering debris but a ureterocele is possible." These developments were "new from the prior exam," and when

defendant received the results, he immediately made a referral for plaintiff to be evaluated by a urologist.  Plaintiff's CK level was 500 - 600 H, which is almost two times more than the high end of the reference range.  On July 7, 2016, plaintiff's CK level increased to 687 H.

5. Urologist appointment and surgery

On August 4, 2016, plaintiff was transferred from Columbia to Stanley Correctional Institution.  On September 2, 2016, plaintiff was taken to the University of Wisconsin Hospital in Madison, Wisconsin, where he was seen by Dr. John Roger Bell, a urologist.  Dr. Bell explained the results of the June 23, 2016 ultrasound to plaintiff and recommended that plaintiff undergo a cystoscopy.  Dr.  Bell's examination notes state that plaintiff was "initially told" that his medical condition was rhabdomyolisis and that he should reduce his physical activity but that plaintiff had had persistent episodes of gross hematuria despite reducing his activity level.

On September 23, 2016, Dr. Bell performed surgery on plaintiff to remove the tumor mass from plaintiff's bladder and test it for cancer.  Test results revealed a diagnosis of stage-2, muscle-invasive bladder cancer.  On December 19, 2016, plaintiff underwent major surgery for the removal of his bladder, prostate, nearby lymph nodes and seminal vesicles.

During defendant's care and treatment of plaintiff, he did not suspect that plaintiff had bladder cancer because plaintiff was comparatively young and did not have symtoms of concern accompanying his elevated CK levels.  (Defendant describes plaintiff's CK levels as

"slightly elevated," but plaintiff emphasizes that they were double the high end of the reference range.)

### D. Dr. Bell's Expert Opinion

1. Rhabdomyolysis versus bladder cancer

Dr. Bell did not offer an opinion regarding the proper treatment for rhabdomyolysis. He testified at his deposition that there is no correlation between the treatment (or failure to treat) rhabdomyolysis and bladder cancer. Elevated CK levels are not typically related to bladder cancer, although they can be elevated in other conditions associated with muscle injury or inflammation. In theory, a tumor involving the muscle could cause an elevated CK level, but Dr. Bell would not expect this from bladder cancer.

Although Dr. Bell's expertise in treating patients with outpatient rhabdomyolysis is quite limited, he opined that plaintiff likely had rhabdomyolysis during the time that he was treated by defendant. Several of plaintiff's 10 blood tests were consistent with the diagnosis of rhabdomyolysis. Hematuria (blood in the urine) is not a significant finding in rhabdomyolisis. However, but dark red or brown urine or decreased urination is a hallmark symptom of rhabdomyolysis. An elevated CK level is the most sensitive laboratory test for evaluating an injury to the muscle that has the potential to cause rhabdomyolysis.

One of the challenges of diagnosing exertional rhabdomyolysis is the fact that CK levels will naturally rise after strenuous activity. A patient's failure to follow a doctor's recommendation could complicate a doctor's ability to diagnose a patient. In addition, to

avoid acute kidney injury associated with rhabdomyolysis, increased fluid intake is recommended when rhabdomyolysis is suspected.

2. Evaluating hematuria

According to Dr. Bell, urinalysis showing red blood cells is not necessarily indicative of rhabdomyolisis and should be evaluated under a hematuria pathway. The American College of Physicians recommends that patients with hematuria be referred to a urologist in the absence of a benign cause. The 2012 American Urological Association's Guideline on the Diagnosis, Evaluation and Follow-Up of Asymptomatic Microhematuria (Amh) In Adults states that "in complex patients, such as those with a known underlying benign cause of [hematuria] (e.g., asymptomatic stones, catheterization), the risk for concurrent disease remains and these patients should be evaluated periodically at clinician discretion." Dkt. #73-3 at ¶ 3.

Plaintiff's urinalysis from August 2015 showed 1125 red blood cells, and his follow-up urinalysis in November 2015 showed more than 100 red blood cells. Dr. Bell testified that "at that point, given that there had been a three-month time span with persistent hematuria, my recommendation would be that a urologic referral should have been sought at that time." Dkt. #73 at 35. However, Dr. Bell was unable to state, with any degree of certainty, that an earlier referral or evaluation by a urologist would have resulted in a different outcome for plaintiff. He explained that he did not have "any sort of crystal ball to know what would have been different if [plaintiff] had been seen a year prior to his presentation [at the

13

University of Wisconsin hospital].” Id. at 36.  He also testified that “lower stage bladder cancer has different treatment options compared to stage 2 and higher and . . . bladder sparing treatments are routinely used for lower stage tumors.”  Id.

Ultrasounds are typically used by urologists to assess the volume of urine to see whether the patient is emptying their bladder.  However, the urological guideline does not recommend it for hematuria (blood in urine).  Rather, a computerized tomography (CT) urography is the first recommendation for hematuria.  When asked about the first test that should be used in a primary care setting to determine the cause of hematuria, Dr. Bell responded that he was unable to answer that question because he is not a primary care physician.  However, he did state that a bladder ultrasound is not in any of the guidelines or recommendations for urologic evaluation of those symptoms.

3.  Diagnosing bladder cancer

According to Dr. Bell, most patients with bladder cancer are diagnosed in their sixties and seventies, and 90 percent of people with bladder cancer are diagnosed over the age of 55.  The most common symptom of bladder cancer is gross hematuria.  However, the majority of patients who have hematuria do not have bladder cancer because hematuria can be a sign of other common conditions that are benign.  Some patients with bladder cancer may have additional symptoms, including urgent and frequent urination, pain or burning during urination, lower back pain and pain on one side of the body.  Most patients are asymptomatic immediately prior to a bladder cancer diagnosis except for hematuria.

Dr. Bell stated the opinion that cystoscopy (an endoscopy of the bladder via the urethra) is the "gold standard" for visualizing bladder pathology. However, he admits that a cystoscopy would not necessarily detect bladder cancer in the early stages:

> The ability of cystoscopy to detect bladder cancer in the early stages varies. There is currently no screening protocol for urothelial cancer and evaluation is only undertaken at the onset of possible symptoms. Therefore, cystoscopy would help confirm the presence or absence of bladder cancer, but the stage of bladder cancer at the time cystoscopy would be entirely dependent on how early in the disease the patient had symptoms. Furthermore, the biology of different patients' bladder cancer varies widely and is independent of timing of diagnosis.

Dkt. #73-3.

Dr. Bell could not state with certainty at what point plaintiff's cancer progressed from a low stage to a higher stage. The growth rate of cancer is patient-specific and based on tumor biology and other factors. Therefore, Dr. Bell could not state an opinion about whether plaintiff's bladder cancer advanced from stage 0 to stage 2 as a result of defendant's alleged delay in detecting and treating plaintiff. Dr. Bell also testified that he does not know whether an earlier diagnosis, such as upon plaintiff's initial presentation with hematuria, would have resulted in a different treatment plan for plaintiff's bladder cancer. Even if conservative measures were initially taken to treat plaintiff's cancer, it is entirely possible that he still may have required a radical cystectomy to successfully treat his cancer. After cancer has invaded the bladder muscle, removal of the bladder is the standard treatment. Having received this treatment, plaintiff has a good prognosis.

OPINION

Plaintiff alleges that had defendant taken reasonable measures to respond to his symptoms, his cancer would have been diagnosed earlier and he would not have had to undergo such extensive surgery. Specifically, plaintiff alleges that defendant acted with deliberate indifference and negligence to his hematuria, high CK levels, high red blood cell count and complaints of kidney pain by failing to: (1) change an ineffective course of treatment for plaintiff's rhabdomyolisis or discover its triggering event; (2) treat plaintiff's pain; and (3) refer plaintiff to a urologist or take other measures to address his hematuria for 10 months, which resulted in the delayed discovery and treatment of his bladder cancer.

A. Legal Standard

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, Gutierrez v. Peters, 111 F.3d 1364, 1371-73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and

disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Snipes v. Detella, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996). To establish that a medical professional consciously disregarded an inmate's serious medical need, a plaintiff must show that the challenged treatment decision was so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment. Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008).

A claim for negligence under Wisconsin law is subject to a less demanding standard than an Eighth Amendment deliberate indifference claim, requiring "the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." Paul v. Skemp, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Wisconsin law generally requires expert testimony to establish medical negligence. Gil v. Reed, 535 F.3d 551, 557 (7th Cir. 2008). Expert testimony is not required in the unusual case in which a layperson could conclude from common experience that the plaintiff's injury could not have occurred if the medical provider had exercised proper care and skill. Id.


B. Deliberate Indifference

1. Treatment for rhabdomyolisis

Most of the underlying facts concerning plaintiff's symptoms and treatment are undisputed. Plaintiff first reported blood in his urine to defendant on August 14, 2015. Defendant ordered laboratory tests and a bladder and kidney ultrasound to rule out bladder and kidney abnormalities. Although plaintiff's ultrasound did not show any abnormalities, testing revealed a high level of red blood cells (1125) in his urine and an elevated CK level (573 H). Plaintiff's CK level was almost twice the normal limit of 300 H, which is clinically considered rhabdomyolysis. Defendant diagnosed plaintiff with rhabdomyolisis and told plaintiff to stop exercising and drink water.

Although plaintiff says that he followed these instructions, his CK levels, which are associated with rhabdomyolysis, fluctuated during the next few months: 406 H on September 22, 2015, 723 H on October 22 and 880 H on November 20. Plaintiff asked for additional treatment for rhabdomyolysis on November 9 and 18, 2015, in the form of intravenous fluids and a referral to a urologist, but defendant chose to continue to monitor plaintiff's CK levels, apparently thinking that plaintiff's CK levels were increasing because he was engaging in vigorous exercise. To help address this, defendant ordered a 30-day exercise restriction for plaintiff on November 19, 2015. Although plaintiff's CK level further increased to 1087 H on December 9, it decreased to 688 H on December 30 and 651 H on January 13, 2016. At this point, defendant reasonably believed that the conservative treatment had worked to address what he considered to be plaintiff's mild rhabdomyolysis.

Plaintiff did not report any other urinary symptoms until February 9, 2016, when he stated that he had started to urinate blood again the previous day and that he had "extreme"

pain in his kidney region and when he urinated. Defendant saw plaintiff and suspected rhabdomyolysis and a potential urinary tract infection. A February 26, 2016 test showed that plaintiff's CK level had increased to more than 1,700 H. Defendant continued to monitor plaintiff's CK level, which decreased to 553 H on March 11, 2016. According to defendant, these test results confirmed that plaintiff had experienced another bout of mild rhabdomyolysis in February 2016. Defendant did not order follow-up CK level testing because he believed that plaintiff's fluctuating CK levels were evidence of mild rhabdomyolysis.

Although plaintiff's CK level remained elevated throughout defendant's course of treatment of plaintiff, defendant did not believe that it rose to the level of what a physician would consider serious rhabdomyolysis, particularly because plaintiff's kidney function was normal, he did not exhibit other symptoms of concern, he was otherwise stable and appeared well. Therefore, defendant did not provide any other treatment for plaintiff's rhabdomyolisis other than hydration, reduction of exercise and blood test monitoring. Although plaintiff faults defendant for never confirming the triggering event for plaintiff's rhabdomyolisis, defendant explained that he could not have discovered the cause without daily lab tests and constant monitoring, which were not feasible in plaintiff's case. Plaintiff has not contradicted this testimony and also has not shown that the discovery of the specific triggering event would have changed defendant's assessment or treatment decisions regarding plaintiff's rhabdomyolysis. Further, even though plaintiff seems to suggest otherwise, Dr.

Bell testified that there is no correlation between the treatment (or failure to treat) rhabdomyolysis and bladder cancer.

Plaintiff has failed to show, either through Dr. Bell's opinion or any other evidence, that defendant's chosen course of treatment for plaintiff's rhabdomyolysis so departed from accepted professional practice as to allow the jury to infer indifference. As the Court of Appeals for th Seventh Circuit has observed, "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'" Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996).

It is undisputed that there is no specific time line for determining the effectiveness of a treatment plan for rhabdomyolisis and that blood tests are used to see whether CK levels are trending up or down and to monitor general functioning. If a patient's CK levels are trending down, it means his rhabdomyolisis is responding to treatment. However, if there is a spike in the CK level, it could indicate that the triggering event, such as exercising, had occurred or resumed. According to defendant's uncontradicted medical opinion, if an event such as a rigorous workout triggers a bout of rhabdomyolysis, CK levels will drastically increase but then will decrease within a few weeks, which is what occurred in plaintiff's case on three different occasions between August and September 2015, October and December 2015 and February 26 and March 11, 2016. In addition, severe disease occurs only after CK levels exceed 5,000, and plaintiff's CK levels never came close to being this high.

Although Dr. Bell testified that plaintiff likely had rhabdomyolysis during the time that he was treated by defendant, he did not offer any opinion as to defendant's treatment of plaintiff's rhabdomyolysis apart from agreeing that increased fluid intake is recommended to avoid kidney problems.  Plaintiff suggests in his brief that defendant should have treated him with intravenous fluids or medication and ordered a myoglobin test to confirm his diagnosis, but he has not proposed any facts about such treatment options or presented evidence showing that a different type of treatment would have changed defendant's assessment or treatment decisions as to rhabdomyolysis.

Plaintiff's expectation that defendant should have changed his course of treatment based on plaintiff's word alone is not evidence that defendant's treatment was medically unsound.  Thomas v. Martija, 991 F.3d 763, 772 (7th Cir. 2021)  ("It is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment.").  Rather, defendant's decision to monitor plaintiff's condition with an initial ultrasound and regular blood work is owed deference because it was an exercise of his medical judgment.  Pyles v. Fahim, 771 F.3d 403, 411 (7th Cir. 2014) (quoting Estelle v. Gamble, 429 U.S. 97, 107 (1976)) (decisions about need for diagnostic testing are classic example of medical judgment); Bradley v. Dennison, 2021 WL 135095, at *7 (S.D. Ill. Jan. 14, 2021) (defendant physician's treatment decisions are entitled to deference unless no minimally competent professional would have so responded under the circumstances).  Accordingly, defendant is entitled to summary judgment as to plaintiff's claim that he acted with deliberate indifference to plaintiff's rhabdomyolysis.

2. Pain

In his motion for summary judgment, plaintiff generally contends that defendant took no action to relieve his pain and suffering. However, plaintiff has failed to present sufficient evidence from which a reasonable jury could reach this conclusion.

The record shows that plaintiff first complained about having pain on February 9, 2016, when he reported "extreme pain" in his kidney region and pain with urination. Defendant suspected that plaintiff was experiencing another bout of rhabdomyolysis and a possible urinary tract infection. Laboratory testing seemed to confirm defendant's suspicions regarding rhabdomyolysis because plaintiff's CK level was more than 1,700 H on February 26, 2016, and then decreased to 553 H on March 11, 2016.

With respect to pain relief, the undisputed facts show that defendant prescribed Naproxen on May 4. Although plaintiff argues that defendant did nothing to address his pain between February and May, he has not presented any evidence regarding what pain he was experiencing, whether he continued to complain about it after February 12, 2016 or the nature of defendant's response. In fact, medical records show that plaintiff had a prescription for Naproxen that expired in March 2016, meaning that he had been provided with pain medication during at least part of the relevant period. Further, it is undisputed that he could have purchased non-prescription medication on his own. Plaintiff has not presented any evidence that these measures were inadequate or that more could have been done to address his pain or other symptoms.

The record shows that plaintiff's only other complaints of pain were on June 8, 2016, when he was seen in the health services unit for low back pain, and on June 17, 2016, when he reported muscle and low back pain along with other symptoms. Plaintiff generally contends that defendant "did nothing" to alleviate his pain or determine its cause, but the undisputed facts show that defendant ordered prescription-strength Tylenol, lab tests and a bladder ultrasound in June 2016.

Accordingly, defendant is entitled to summary judgment on this aspect of plaintiff's deliberate indifference claim.

3. Hematuria and bladder cancer

Plaintiff contends that the fact that he continued to have blood in his urine in September 2015 (11-25 red blood cells) and November 2015 (more than 100 red blood cells) and again in February 2016, along with kidney pain, should have alerted defendant that something else was wrong with him. In making this argument, he relies in large part on the expert opinion of Dr. Bell, who testified that a urinalysis showing red blood cells should be evaluated under a hematuria pathway and that physician guidelines recommend that patients with hematuria be referred to a urologist in the absence of a benign cause. Dr. Bell stated the opinion that plaintiff should have been referred to a urologist in November 2015 because he had been experiencing persistent hematuria for three months as of that time.

As defendant points out, the facts in this case are quite similar to those in Duckworth v. Ahmad, 532 F.3d 675, 677-78 (7th Cir. 2008), in which the plaintiff sued two prison

doctors for deliberate indifference after they failed to diagnose his bladder cancer, even though he had been complaining of hematuria and stomach pain for 16 months. The court of appeals found that one of the doctors had never suspected cancer and his failure to order additional testing or pursue a "more aggressive treatment" was not the product of deliberate indifference. Id. at 680-81. As for the other doctor, he "was aware that cancer was a risk but erroneously thought that another condition [kidney stones] was more likely causing Duckworth's symptoms" and continued to provide treatment for that condition. Id. at 681.

As in Duckworth, plaintiff has not presented any evidence that defendant knew that plaintiff faced a risk of bladder cancer and disregarded that risk, even if defendant was aware that cancer was a possibility. In fact, it is undisputed that defendant did not consider bladder cancer because plaintiff was comparatively young and did not have any disturbing symptoms accompanying his elevated CK levels. "This may be a fair statement of how a reasonable doctor would have treat [plaintiff's symptoms in November 2015], but it does not shed any into [defendant's] state of mind." Id. (reaching a similar conclusion in ruling out bladder cancer).

Plaintiff attempts to distinguish Duckworth by noting that the physicians in that case took some action to treat Duckworth, even if it was wrong or insufficient, whereas in this case, defendant Syed took no action to determine the cause of plaintiff's symptoms. However, as discussed above, defendant's chosen course of treatment for plaintiff's symptoms did not depart from accepted professional practice to the extent that a jury could infer indifference. Defendant tried to cure what he thought was plaintiff's condition, namely

rhabdomyolysis, which was an opinion he arrived at using his medical judgment. Id. Even Dr. Bell agreed that plaintiff in fact had rhabdomyolysis. Although it might have been advisable for defendant to rule out bladder cancer at an earlier point, his failure to do so falls short of deliberate indifference. Id. ("[I]t may have been prudent for [the doctor] to rule cancer out first. But this is just to reiterate the standard for medical malpractice, which falls short of deliberate indifference."); Johnson v. Hannula, No. 14-cv-155-wmc, 2016 WL 527097, at *12 (W.D. Wis. Feb. 9, 2016) (Although defendants failed to diagnose plaintiff's ulcerative colitis, their "reasonable, if possibly mistaken, explanations for their respective care decisions, and the lack of any evidence suggesting that their care decisions were 'blatantly inappropriate,' or so departed from accepted professional practice" they would not allow a reasonable jury to find that the decision not to order additional tests or perform additional exams amounted to lack of medical judgment.).

Finally, plaintiff argues that defendant's delay in detecting plaintiff's cancer allowed the disease to advance to stage 2 muscle invasive bladder cancer. However, even Dr. Bell was unable to state with any degree of certainty that an earlier referral or evaluation by a urologist would have resulted in a different outcome for plaintiff. According to Dr. Bell, it is not possible to determine when plaintiff's cancer progressed past the point of bladder-sparing surgery. Dr. Bell also testified that he does not know whether an earlier diagnosis would have resulted in a different treatment plan for plaintiff's bladder cancer or prevented the radical surgery he eventually required. Although plaintiff argues that it is reasonable to infer that an earlier detection of his cancer would have prevented it from progressing from stage 0 in

August 2015 to stage 2 in June 2016, he has not shown that defendant's failure to diagnose his bladder cancer sooner rises to the level of deliberate indifference. See Lord v. Beahm, 952 F.3d 902, 905 (7th Cir. 2020) (affirming summary judgment on Eighth Amendment claim against prisoner because, "even viewing the evidence as he urges, he did not show that he experienced any cognizable harm"); Walker v. Leibert, No. 20-3487, 2021 WL 1574432, at *2 (7th Cir. Apr. 22, 2021) ("[T]o the extent Walker seeks damages based on the risk of what could have happened to him as a result, that risk is not actionable under § 1983 without [a showing of] actual injury."); Conner v. Schwenn, 821 Fed. Appx. 633, 635 (7th Cir. 2020) (Eighth Amendment claim based on sanitation problems at prison dismissed because plaintiff alleged only "possibility of infection–he has not alleged that the risk is substantial, much less that he was actually injured by that risk").

Accordingly, defendant is entitled to summary judgment as to plaintiff's claim that he acted with deliberate indifference with respect to the discovery of plaintiff's bladder cancer.

D. Medical Negligence

Defendant also argues that there is no evidentiary support for plaintiff's negligence claim, and that Dr. Bell's expert opinion fails to establish that defendant failed to meet the requisite standard of care and that any negligence by defendant caused or contributed to plaintiff's cancer diagnosis. However, it is unnecessary to address the parties' arguments because I am dismissing plaintiff's state law claim on another ground.

The general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial. 28 U.S.C. § 1367(c)(3); <u>Burritt v. Ditlefsen</u>, 807 F.3d 239, 252 (7th Cir. 2015). In this instance, I will decline to exercise supplemental jurisdiction over plaintiff's state law claim because I am granting summary judgment to defendant on plaintiff's federal claim. Plaintiff may refile his negligence claim in state court, subject to the applicable state statute of limitations.

ORDER

IT IS ORDERED that:

1. Plaintiff Philip Sheahan's motion for the court to take judicial notice of adjudicative facts, dkt. #70, and his motion to supplement the record, dkt. #87, are GRANTED.

2. Plaintiff's motion for summary judgment, dkt. #60, is DENIED.

3. Defendant Dr. Salam Syed's motion for summary judgment, dkt. #74, is GRANTED as to plaintiff's federal claim.

4. Plaintiff's state law negligence claim is DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

5. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 28th day of June, 2021.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge